IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CRAIG A. BATES and
KARLA R. BATES,

        Plaintiffs,

v.                                                         Case No. 19-1101-JWB

GUY M. FLEMMING, KATHRYN MAKEKAU,
and GUYCAT, LLC,

        Defendants.

**MEMORANDUM AND ORDER**

This case comes before the court on Plaintiffs' motion for partial summary judgment and memorandum in support and Plaintiffs' motion for default judgment and memorandum in support. (Docs. 80, 81, 92, 93.) No responses have been filed and the time for doing so has now passed. Plaintiffs' motions are GRANTED IN PART AND DENIED IN PART for the reasons set forth herein.

**I.    Procedural History**

Plaintiffs Craig Bates and Karla Bates (referred to throughout as "Plaintiffs") initially filed this action against Guy Flemming and GuyCat, LLC, in April 2019 in state court and it was removed to this court.[1] (Docs. 1, 5.) This action involves a tragic fire that resulted in the loss of several lives and an insured property. Plaintiffs and Flemming entered into a contract for deed regarding the property, which was owned by GuyCat, a forfeited Kansas limited liability company.

---

[1] The amended complaint also included claims against Pratt County, Kansas. (Doc. 11.) Those claims were dismissed by the court. (Doc. 28.)

After the fire, Flemming allegedly retained the insurance proceeds. Plaintiffs brought several claims against Flemming and GuyCat.

When the action was originally filed, both Flemming and GuyCat were represented by counsel and filed answers. (Docs. 30, 32, 33.) Counsel then moved to withdraw stating that the relationship had been terminated by Defendants. (Doc. 45.) The motion was granted by Magistrate Judge Gale. (Doc. 49.) According to the motion, defense counsel stated that the mailing address for both Flemming and GuyCat, LLC, was Flemming's home address in North Carolina. (Doc. 45 at 1.) Flemming then registered as a pro se participant on CMECF so that he could receive electronic notifications from this case. (*See* docket entry on March 11, 2020.) Flemming actively participated in the defense of this case until early 2021. On October 23, 2020, Plaintiffs filed a second amended complaint (the "SAC"). The SAC names Flemming, GuyCat, and Kathryn Makekau, Flemming's wife, as Defendants. (Doc. 71 at 1.) The SAC states that GuyCat is a Kansas limited liability company that was forfeited in 2007. It further alleges that process can be served on GuyCat by serving Flemming as GuyCat's agent and sole member. (*Id.* at 2.)

The docket sheet shows that summons was issued to Plaintiffs' attorney for service on Makekau. (Doc. 72.) As a pro se registered participant, Flemming received electronic notification of the SAC. On November 22, Flemming filed an answer on his own behalf. (Doc. 74.) Flemming has not retained counsel for GuyCat and no answer was filed on its behalf. A pretrial order was entered on February 18, 2021. (Doc. 79.) Plaintiffs, through counsel, and Flemming appeared at the pretrial conference. Plaintiffs then filed the motion for partial summary judgment as to all Defendants. (Doc. 80.)

Although Plaintiffs provided notice of the motion for summary judgment to Flemming, he has failed to respond to the motion. The court entered an order to show cause regarding the failure

2

to respond. (Doc. 83.) Flemming did not respond to the order. The court subsequently determined that Plaintiffs' service of the summons on Makekau was deficient and granted Plaintiffs' additional time to serve Makekau. (Doc. 86.) Plaintiffs then timely served Makekau and obtained a clerk's entry of default as Makekau failed to answer. (Doc. 91.) Based on the affidavit of Plaintiffs' attorney, Makekau has intentionally avoided being served with the SAC. (Doc. 87, Exh. 2.) Plaintiffs made multiple attempts to serve Makekau at her home address and were unsuccessful. Moreover, it was apparent that there was an individual in the home on at least one attempt. The court further finds that Makekau has had knowledge of this action and the fact that Plaintiffs added her as a Defendant because she has been involved in discovery in this case and Flemming objected to her being added as a party when Plaintiffs moved to amend. (*Id.*, *see also* Doc. 68.)

Plaintiffs have now moved for default judgment against Makekau on all claims based on the allegations in the SAC. (Doc. 92.)

**II.     Facts**

Plaintiffs are husband and wife. They reside in Pratt, Kansas. Flemming and Makekau reside in North Carolina. Prior to living in North Carolina, Flemming and Makekau resided in Pratt. (Doc. 81 at 2.) GuyCat, LLC, is a forfeited Kansas Limited Liability Company and Flemming was its only member. Flemming and/or GuyCat has owned twenty-two properties in Kansas. (Flemming Depo., Doc. 81-2 at 26:14-17; Doc. 81-11.)

In 2004, Flemming purchased real property located at 211 Austin in Pratt, Kansas (the "property"). (Doc. 79 at 3.) At that time, he was married to Makekau. Flemming took out a mortgage on the property with Armed Forces Bank NA ("AFB"). (Doc. 81-12.) On January 30, 2006, Flemming executed a general warranty deed transferring his interest in the property to GuyCat. (Doc. 81-11.) Based on the deed, Flemming transferred four other properties to GuyCat

3

on that same date. (*Id.*) Makakau was not listed on any of the deeds pertaining to the Pratt property and was not a party to the mortgage.

On April 15, 2011, Plaintiffs and Flemming entered into a seller-financed Agreement for Deed Contract (the "contract") for the purchase of the property. (Doc. 81-10.) The contract identifies Flemming as the seller and Plaintiffs as the purchasers. At the time of the purchase, the mortgage with AFB remained on the property. This was reflected in the contract which was prepared by Flemming or someone at Flemming's request. Flemming could not recall who prepared the contract. Under its terms, the purchase price of the property was $60,000. Plaintiffs received an initial credit of $5,000 on the purchase price so that Plaintiffs could refinish the basement. (*Id.* at 1.) Plaintiffs were to place an initial deposit of $5,500, leaving the balance due under the contract as $49,500. The property was financed by Flemming and required monthly payments of $615.54 for a term of twenty years. (Docs. 81-10, 81-14.) The interest rate on the loan was fourteen percent per annum. (Doc. 81-10.) In addition to the monthly payment of principal and interest, Plaintiffs were required to pay monthly payments toward the maintenance of a fire insurance policy ($133.51) and property taxes ($87.17).[2] (Docs. 81-10, 81-14.) The total monthly payment under the contract was $836.22, which did not change. (Docs. 81-10, 81-4, 81-13.) Flemming was to hold the insurance and tax escrow payments in a separate account. There is no evidence of a separate account. The monthly escrow payment was never recalculated to correspond with the changes in taxes and insurance.

With respect to the insurance policy to be purchased, the contract stated as follows: "Seller shall maintain fire policy insurance on said real estate in an [sic] type approved by the current mortgage holder. Buyer should have own renters insurance to cover buyers [sic] own personal

---

[2] The contract does not state the amount required to pay for the insurance and property taxes. These amounts were included in the amortization schedule. (Doc. 81-14.)

property. Fire policy only covers dwelling." (Doc. 81-10 at 1.) Flemming purchased insurance through USAA Casualty Insurance Company. Plaintiffs believed that the insurance policy was intended to protect their interests in the property. (Docs. 81-4, 81-5.) Craig Bates stated that Flemming led him to believe that Plaintiffs were named on the policy in some way. (Doc. 81-4 at 5.) Plaintiffs, however, were not named as beneficiaries on the insurance policy. Flemming never instructed Plaintiffs that they were required to purchase a separate policy to insure the property although Plaintiffs were aware that they needed a separate policy to protect their personal property. (Doc. 81-4 at 5.)

Plaintiffs were directed to make the loan payments in care of GuyCat at the First State Bank in Pratt (the "bank"). The deposits to the GuyCat account show that Flemming and Makekau used this account to pay for their personal expenses, such as entertainment, cosmetics, groceries, and veterinarian expenses. Flemming also deposited his own personal paychecks into the account.

At some time in 2012, a USAA representative inspected the property. During the inspection, she requested that Craig make repairs to the property and remove a trampoline. Craig made the requested repairs. In May 2012, Flemming failed to purchase fire insurance for the property and, as a result, AFB purchased insurance for the property from May 2012 until May 2014. (Docs. 81-19, 81-20.) This policy only covered the outstanding principal balance of the mortgage. Plaintiffs were not informed that Flemming had failed to maintain insurance on the property. In 2013, Flemming encouraged Plaintiffs to shop around for new insurance. Craig visited with several local agents; however, Flemming decided that the property would remain insured with USAA. (Docs. 81-4, 81-5.) In 2013, Plaintiffs were instructed to make the payments to the bank in care of Flemming after he had closed the GuyCat accounts. (Docs. 81-4 at 3, 81-16.) In May 2014, Flemming again purchased USAA insurance for the property.

5

On December 27, 2017, a fire destroyed a garage on the property. Following this loss, Craig and Flemming discussed how to spend the insurance proceeds. Craig had requested a prefabricated garage. (Doc. 81-4 at 5.) The record does not indicate what, if anything, was done regarding this claim.

On January 25, 2018, the property was completely destroyed by fire. The fire also resulted in the deaths of five members of Plaintiffs' family. At the time of the fire, Plaintiffs had made all of the required monthly payments on the property. On the day of the fire, Flemming made a claim with USAA. On February 6, 2018, USAA paid $256,000 to Flemming, Makekau, and AFB. The total amount was the coverage limit on the policy. AFB retained $15,355.40, which was the outstanding mortgage balance, and Flemming and Makekau received $240,644.60. (Docs. 79 at 2, 81-22, 81-24.) Flemming failed to tell Plaintiffs that he made a claim on the loss. Six days after receiving the proceeds on the claim, Flemming texted Plaintiffs to say that the investigation on the fire was not finished and called the policy a "landlord policy only." (Doc. 81-24.) Flemming and Makekau used the proceeds to pay for a new residence for themselves in North Carolina. (Doc. 81-25.) They refused to give Plaintiffs any portion of the proceeds. Flemming also retained $3,304.25 in escrow payments that he did not use to purchase insurance or pay property taxes. (Doc. 81-6.)

The interest rate on the contract purchase price was fourteen percent. Pursuant to K.S.A. 16-207, the maximum allowable interest rate in April 2011 was 6.16 percent. According to Plaintiffs' expert, Lorin Haas, CPA, Plaintiffs paid an additional $29,256.55 due to the excessive interest rate. (Doc. 81-6 at 8, 12.) According to Haas, the total outstanding balance on the loan would have been only $6,207.73 at the time of the fire had the excess escrow payments been applied to the balance and if the statutory interest rate had been applied. (*Id.* at 12.)

### III. Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). Even when a dispositive motion is unopposed as in this case, the court remains obligated to determine if the summary judgment motion is properly supported. *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002).

### IV. Analysis

#### A. Alter Ego

Plaintiffs move for summary judgment on their declaratory judgment claim seeking to pierce the corporate veil. Plaintiffs ask the court to find that "Defendant Flemming is the alter ego of Defendant GuyCat, LLC and Defendant GuyCat, LLC is the alter ego of Defendant Flemming so that Flemming is held responsible for the liabilities of GuyCat, LLC and GuyCat, LLC is held responsible for the liabilities of Flemming." (Doc. 81 at 34.) Plaintiffs argue that Flemming is the alter ego of GuyCat because he has used the limited liability company as an instrumentality to conduct his own personal business. With respect to piercing the corporate veil, the Kansas Supreme Court has instructed courts to "disregard the fiction of a separate legal entity when there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal." *Dean Operations, Inc. v. One Seventy Assocs.*, 257 Kan. 676, 681, 896 P.2d 1012, 1016 (1995).

7

As an initial matter, Plaintiffs seek to use veil piercing in the traditional sense as well as in the reverse - a declaration by the court that the corporate entity is liable for Flemming's liabilities because he is an owner of GuyCat and did not keep the corporation separate from him. Plaintiffs, however, focus on the traditional form of veil piercing and do not specifically discuss how the court can hold GuyCat liable for Flemming's debts. It cannot. The Tenth Circuit has held that Kansas has not adopted reverse alter ego liability. *Floyd v. I.R.S. U.S.*, 151 F.3d 1295, 1300 (10th Cir. 1998). Because Kansas has not adopted this theory of liability, Plaintiffs cannot use the theory in order to hold GuyCat liable for Flemming's liabilities. *Id.*; *see also Bettis v. Hall,* No. 10-2457-JAR, 2011 WL 1430327, at *3 (D. Kan. Apr. 14, 2011). In an unpublished decision by a panel of the Kansas Court of Appeals, the appellate court agreed with the Tenth Circuit and declined to adopt "reverse veil-piercing" in that case. *Lemus v. Horizon Exp., Inc*., 196 P.3d 1232, 2008 WL 5234543, at *3 (Kan. Ct. App. 2008) (finding that "if there is some limited circumstance in which reverse veil-piercing should be allowed, Lemus' case certainly is not it.") Therefore, Plaintiffs' motion for summary judgment seeking declaratory relief that GuyCat is liable for Flemming's liabilities is denied.

Turning to Plaintiffs' claim of traditional veil piercing, in deciding whether to disregard the corporate entity and hold Flemming liable for GuyCat's debts, the court is to look to the following eight factors:

> (1) undercapitalization of a one-man corporation,
> (2) failure to observe corporate formalities,
> (3) nonpayment of dividends,
> (4) siphoning of corporate funds by the dominant stockholder,
> (5) nonfunctioning of other officers or directors,
> (6) absence of corporate records,
> (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and
> (8) the use of the corporate entity in promoting injustice or fraud.

*Wichita Destination Devs., Inc. v. Focus Hosp. Servs., LLC*, 365 F. Supp. 3d 1172, 1177–78 (D. Kan. 2019) (citing *Kinder v. QI Enterprises, LLC*, No. 111537, 2015 WL 1124603, at *2 (Kan. App. Ct. Mar. 6, 2015)). "Not all factors must be present, and any one factor could be enough to justify disregarding the corporate entity." *Id.*

After a review of the undisputed facts and considering the factors above, the court finds that disregarding the corporate entity is appropriate in this case. The record shows that Flemming was the initial owner of the property in 2004. In 2006, Flemming transferred his interest in the property to GuyCat, along with his interest in four other properties. (Doc. 81-11.) Flemming was the only member of GuyCat and it was forfeited by the Kansas Secretary of State on July 15, 2007. Even though GuyCat was the record owner of the property, Flemming entered into a contract with Plaintiffs for the purchase of the property. The contract does not identify GuyCat as the property owner. Flemming maintained a mortgage in his own name with AFB even though the owner of the property was GuyCat. Although Plaintiffs were initially to make their payments to GuyCat, they were later instructed by Flemming to make the payments to him at the bank. The bank statements for the GuyCat account show that Flemming and Makekau used this account to pay for their personal expenses, such as entertainment, cosmetics, groceries, and veterinarian expenses. (Doc. 81-17.) There is no evidence that these types of expenses were typical expenses for GuyCat, which was essentially title owner to rental real estate. Flemming also deposited his own personal paychecks into the account. Flemming then received the insurance proceeds after the fire.

Turning to the factors, the undisputed facts show a complete failure to observe corporate formalities by GuyCat. Although GuyCat continued to be in existence and own property, it failed to maintain its corporate status with the state of Kansas. The record also supports a finding that Flemming has been utilizing GuyCat's funds for his own personal gain. There is no distinction

between the assets of GuyCat and those of Flemming. Rather, Flemming utilized GuyCat's business account as his own personal bank account. There is a lack of corporate records although Plaintiffs attempted to obtain these records through discovery. Based on the undisputed facts, Flemming formed GuyCat to protect himself from personal liability pertaining to his real estate and then ignored the corporate structure. The court finds that GuyCat did not have its own separate existence but was merely a business conduit for Flemming. *Dean Operations, Inc.*, 257 Kan. at 681. Therefore, Plaintiffs' motion for summary judgment on their claim seeking to pierce the corporate veil is granted. The court declares that Flemming is the alter ego of GuyCat, such that Flemming is liable for the liabilities of GuyCat.

### B. Declaratory Judgment on usurious interest

Plaintiffs move for summary judgment on their claim for a declaration that the interest rate charged on the contract was usurious. According to the contract, the interest rate was fourteen percent a year on the outstanding balance. The contract is titled an "Agreement for Deed Contract." The usury statute that was in effect at the time the contract was entered into, K.S.A. 16-207, provides limits to interest on certain contracts or agreements.[3] The statute provided as follows:

> The maximum rate of interest per annum for notes secured by real estate mortgages and **contracts for deed to real estate** governed by this subsection shall be at an amount equal to 1 ½ percentage points above the yield of thirty-year fixed rate conventional home mortgages committed for delivery within 61 to 90 days accepted under the federal home loan mortgage corporation's daily offerings for sale on the last day on which commitments for such mortgages were received in the preceding month unless otherwise specifically authorized by law.

K.S.A. 16-207(b) (1999) (emphasis supplied).

---

[3] The current version of the statute provides that an interest rate on a contract for deed cannot exceed 15%, with certain exceptions under the statute. K.S.A. 16-207.

The Kansas Secretary of State is charged with publishing notice of the maximum interest rate under K.S.A. 16-207(b) during the applicable time periods. *See Beltz v. Dings,* 27 Kan. App. 2d 507, 513, 6 P.3d 424, 430 (2000). The maximum allowable rate of interest on a contract for deed to real estate was 6.16 percent in April 2011. *Kansas Secretary of State*, Finance Rates, at https://sos.ks.gov/business/finance-rates.html (last accessed 12/29/2021). Therefore, under K.S.A. 16-207(b), the contract's fourteen percent interest exceeded the statutory limitation.

The court finds that the interest charged under the contract was in excess of the amount allowed under K.S.A. 16-207(b) at the time the contract was entered into and, therefore, was usurious.

### C.   Common Law Usury

Although Kansas law does not allow a plaintiff to bring a usury claim directly under the usury statute, a plaintiff may bring a common law usury claim. *See Young v. Barker*, 185 Kan. 246, 257-58, 342 P.2d 150 (1959). To succeed on their claim, it must be shown that there was a contract for deed in which Plaintiffs were required to pay the lender for the real estate, the lender charged and collected an interest rate in excess of the statute, and Plaintiffs paid interest in excess of the statute. *See Beltz*, 27 Kan. App. 2d at 513. Plaintiffs made the monthly payments of $836.22 due under the contract, which included the installment payments (principal and interest) and escrow (insurance and taxes). (Docs. 81-10; 81-13.) These payments were made during the relevant time periods to GuyCat and/or Flemming. These payments did not change. Based on the undisputed facts, the court finds that Plaintiffs have established their claim and are entitled to summary judgment.

In support of their claim, Plaintiffs have attached an affidavit from their damages expert, Lorin Haas, who is a certified public accountant (CPA). (Doc. 81-6.) Haas has calculated that

11

Plaintiffs paid an additional $29,256.55 of interest over the maximum statutory amount. (Doc. 81-6 at 8, 12.) The court has reviewed Haas' qualifications and finds that he is qualified as an expert in accounting matters. Fed. R. Civ. P. 702. Moreover, he is qualified to opine regarding the excess interest payments made by Plaintiffs over the life of the loan. Therefore, Plaintiffs have established that they are entitled to $29,256.55 due to the excessive interest on the contract. Plaintiffs seek to apply that amount towards the principle of the loan on the contract, which will be discussed *infra*.

Plaintiffs' motion for summary judgment against Flemming and GuyCat on the common law usury claim is granted.

### D. Breach of Contract

#### 1. Failure to Pay Insurance Proceeds to Plaintiff

Plaintiffs move for summary judgment on their claim of breach of contract against Flemming.[4] To state a claim for breach of contract under Kansas law, Plaintiffs must show: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the [Plaintiffs'] performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to [Plaintiffs] caused by the breach." *Lawson v. Spirit AeroSystems, Inc.*, No. 18-CV-01100-EFM-KGS, 2018 WL 3973150, at *5 (D. Kan. Aug. 20, 2018) (citing *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1098 (2013)).

Plaintiffs move for summary judgment on the basis that Flemming breached the contract when he failed to pay Plaintiffs the insurance proceeds in accordance with their interest as equitable owners of the property. The court finds that the undisputed facts show that Flemming

---

[4] Although the heading in the memorandum states that "Defendants Flemming and GuyCat Breached the agreement for deed contract," Plaintiffs do not discuss how GuyCat breached the contract. (Doc. 81 at 16.) Reviewing the contract, GuyCat is not a party to the agreement for deed contract. Therefore, to the extent Plaintiffs are seeking summary judgment against GuyCat on this claim, it is denied.

breached the contract when he failed to pay out the insurance proceeds in accordance with the parties' interest in the property.

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction." *Carrothers Const. Co. v. City of S. Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009) (citing *Anderson v. Dillard's, Inc*., 283 Kan. 432, 436, 153 P.3d 550 (2007)). "Ambiguity in a contract does not appear until two or more meanings can be construed from the contract provisions." *Id.* (citing *Gore v. Beren*, 254 Kan. 418, 426–27, 867 P.2d 330 (1994)). In interpreting the contract, the court should not isolate any particular provision but construe the entire contract together. *Wichita Clinic, P.A. v. Louis*, 39 Kan. App. 2d 848, 853, 185 P.3d 946, 951 (2008). "The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided." *Id.* (citing *Johnson County Bank v. Ross*, 28 Kan.App.2d 8, 10–11, 13 P.3d 351 (2000)).

The terms of the contract regarding property insurance include the following: "Seller shall maintain fire policy insurance on said real estate in an [sic] type approved by the current mortgage holder. Buyer should have own renters['] insurance to cover buyers [sic] own personal property. Fire policy only covers dwelling…. Craig and Karla Bates - 211 Austin Street, Pratt Kansas 67124[.] Taxes 2011 $1046.12 Insurance 2011 $1602.11." (Doc. 81-10 at 1, 3.)

Based on the evidence, the parties intended and understood that the insurance was to be for the benefit of both parties in order to protect their interests. The contract states that Flemming must maintain the fire policy on the property, which was being purchased by Plaintiffs. The contract also specifically states that Plaintiffs would need a separate policy to protect any personal items in the home. The fire policy was to cover the dwelling. Under Kansas law, Plaintiffs are

13

the equitable owners of the real property and the seller retains title as security for the contract. *Minium v. City of Morland*, No. 107,689, 2013 WL 517927, at *5 (Kan. Ct. App. Feb. 8, 2013) ("Kansas courts consistently have held that a purchaser in a sale of real estate under an installment land contract (also called a contract for deed by Kansas courts) 'becomes the equitable owner of the realty' and the seller is the 'holder of the legal title.'" *Graham v. Claypool*, 26 Kan. App. 2d 94, 95–96, 978 P.2d 298 (1999).")  Therefore, reading the contract as a whole, the court finds that a reasonable interpretation of the contract required Flemming to maintain the policy for Plaintiffs and Flemming as they both had an interest in the property.

Plaintiffs have sufficiently established that Flemming breached the contract by failing to protect their interest in the property by not distributing the proceeds to Plaintiffs to account for their interest in the property after the loss occurred.  Plaintiffs have introduced evidence showing that this breach resulted in damages to Plaintiffs as Flemming converted all of the funds from the insurance payment to his own use.  Plaintiffs are entitled to summary judgment against Flemming on their claim of breach of contract based on the failure to distribute the insurance proceeds.

### 2. Failing to Properly Apply Escrow Funds

Next, Plaintiffs claim that Flemming breached the duty of good faith and fair dealing by converting the escrow funds for his own use.  "Kansas law implies a duty of good faith in every contract."  *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1345 (D. Kan. 2016).  This duty grows out of the contract obligations and "only amplifies duties and rights already existing under the terms of the agreement."  *Id.* (citing *Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1179 (D. Kan. 1990)).  To prevail on this claim, Plaintiffs must "(1) plead a cause of action for breach of contract, not a separate cause of action for breach of duty of good faith, and (2) point to a term of the contract which the defendant allegedly violated by failing

14

to abide by the good faith spirit of that term." *Terra Venture, Inc. v. JDN Real Est. Overland Park, L.P.*, 443 F.3d 1240, 1244 (10th Cir. 2006) (quoting *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996) (internal quotations omitted).

Here, Plaintiffs did allege a claim of breach of contract for the conversion of the escrow funds that were not used to pay the taxes or insurance. (Doc. 71 at 9-10.) Plaintiffs further alleged that Flemming breached the duty of good faith and fair dealing by converting those funds for his own use. The terms of the contract clearly state that $220.68 per month was to be used for taxes and insurance. (Doc. 81-10 at 3.) Flemming failed to abide by the good faith and spirit of the contract when he retained escrow funds paid by Plaintiffs that were not used for taxes and/or insurance. Based on the evidence, Flemming retained $3,304.25 in escrow payments and did not return those funds to Plaintiffs. Therefore, Plaintiffs have established that they are entitled to summary judgment on their claim of breach of contract due to Flemming's breach of his duty of good faith and fair dealing by failing to properly apply the escrow payments.

Plaintiffs' motion for summary judgment on this claim is granted.

**E.     Damages**

Plaintiffs seek damages in the amount of $249,792.27 due to Flemming's breach of contract and duty of good faith. Reviewing the evidence, Flemming and Makekau received a payment of $256,000 from the insurance policy.[5] They did not provide any funds to Plaintiffs. Plaintiffs have established that the remaining balance on the contract for deed was $6,207.73 on January 25, 2018, the date of the fire. This amount has been calculated by Haas after applying the converted escrow payments and excess interest to the principle. Therefore, out of the $256,000 received by Flemming and Makekau, Plaintiffs have established that they were entitled to $249,792.27 as the

---

[5] The evidence is that a portion of those proceeds was used to pay Flemming's liability on the mortgage. Those funds benefited Flemming by paying off his debt to the property.

equitable owners at the time of the fire. Flemming was only entitled to retain $6,207.73 of those funds. As a result, Plaintiffs are entitled to judgment against Flemming and in favor of Plaintiffs for $249,792.27.

### F. Remaining Claims Against Flemming

Finally, Plaintiffs move for summary judgment against Flemming on their claims of breach of fiduciary duty, unjust enrichment, and constructive trust. Initially, the court notes that a constructive trust is an equitable remedy and not an independent cause of action. *Nelson v. Nelson*, 205 P.3d 715, 723 (Kan. 2009). Plaintiff's claims of breach of fiduciary duty and unjust enrichment are based on underlying claims as to which the court has already determined that judgment in Plaintiffs' favor is warranted. Plaintiffs do not seek any additional damages on these claims. Therefore, the court need not determine whether Flemming breached a fiduciary duty. *See Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 998 n.1 (10th Cir. 2008). Moreover, Plaintiffs are not entitled to recover on their equitable claim of unjust enrichment and the corresponding remedy of a constructive trust because they already have an adequate remedy available. *See Shafer, Kline & Warren, Inc. v. The Allen Grp.-Kansas City, LLC*, No. 13-2472-JAR-TJJ, 2014 WL 1974525, at *2 (D. Kan. May 15, 2014) (citing *Nelson,* 205 P.3d at 734).

Therefore, Plaintiffs' motion for summary judgment on the claims of breach of fiduciary duty and unjust enrichment is denied.

### G. Defendant Kathryn Makekau[6]

Plaintiffs now move for default judgment against Makekau. Default judgment may be entered against a party who fails to appear or otherwise defend. Fed. R. Civ. P. 55. Plaintiffs must

---

[6] Plaintiffs also moved for summary judgment against Makekau. However, as discussed herein, Makekau was not properly served with this action prior to the motion for summary judgment. (*See also* Docs. 84, 86.) Therefore, Plaintiffs' motion for summary judgment against Makekau is denied.

first seek an entry of default from the clerk and then move for default judgment with the court. *Id.* The decision to enter default judgment is "committed to the district court's sound discretion." *Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1124 (10th Cir. 2003) (quoting *Dennis Garberg & Assocs. V. Pack-Tech Int'l Corp.*, 115 F.3d 767, 771 (10th Cir. 1997)). Because Makekau failed to answer, plead, or otherwise defend this action, she is deemed to have admitted the factual allegations of the complaint as true. *Id.* at 1125. A court may enter a default judgment without a hearing if the amount claimed is a liquidated sum or one capable of mathematical calculation. *Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir. 1983); *Hermeris, Inc. v. McBrien*, No. 10-2483-JAR, 2012 WL 1091581, at *1 (D. Kan. Mar. 30, 2012) ("Damages may be awarded only if the record adequately reflects the basis for award via a hearing or a demonstration by detailed affidavits establishing the necessary facts.") (citation omitted).

Before entering default judgment against Makekau, the court has an affirmative duty to look into its jurisdiction over the parties. *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986); *see also Hukill v. Okla. Native Am. Domestic Violence Coalition*, 542 F.3d 794, 797 (10th Cir. 2008) ("[A] default judgment in a civil case is void if there is no personal jurisdiction over the defendant."). In this case, the court finds that Plaintiffs have properly served Makekau at her home in North Carolina as set forth herein and documented in Plaintiffs' motion. (Doc. 93.) Also, the court has subject matter jurisdiction over this case because all Defendants are citizens of states other than Kansas and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Although GuyCat is a forfeited Kansas limited liability company, its sole member is a citizen of North Carolina. Therefore, GuyCat is a citizen of North Carolina. *Elan Pharms., LLC v. Sexton*, 421 F. Supp. 3d 1119, 1129 (D. Kan. 2019).

1. **Quiet Title**

Turning to the claims, Plaintiffs seek to quiet title to any interest Makekau has in the Pratt property and seek judgment on its claim of unjust enrichment against Makekau. Kansas's quiet title statute creates a "[r]ight of action" that "may be brought by any person claiming title or interest in personal or real property, including ... mineral or royalty interests, against any person who claims an estate or interest therein adverse to him or her, for the purpose of determining such adverse claim." K.S.A. 60-1002(a). In order to succeed on a quiet title action, 1) a person must claim 'title or interest' in the real property; 2) the person against "whom the action is brought must 'claim[ ] an estate or interest therein which is adverse to that of the owner' who filed the action; and [3]] 'the action may be brought for the purpose of determining such adverse claims.'" *Leathers v. Leathers*, 856 F.3d 729, 747–48 (10th Cir. 2017) (quoting *LaBarge v. City of Concordia*, 23 Kan. App. 2d 8, 927 P.2d 487, 494 (1996) (internal quotation marks omitted).

Based on the allegations in the SAC, Plaintiffs have claimed title to the property. However, Plaintiffs have not alleged that Makekau claims an interest in the property. Rather, Plaintiffs allege that she has an inchoate interest in the property due to her status as Flemming's spouse. There is no evidence, however, that Makekau has claimed an interest in the property and the deed in the record does not reflect her name on the title. Therefore, the court cannot enter default judgment on Plaintiffs' quiet title claim as the undisputed elements do not establish that Makekau has claimed an interest in the property.

### 2. Unjust Enrichment

Plaintiffs also move for default judgment on their claim of unjust enrichment against Makekau and ask the court to enter a constructive trust on the North Carolina property Flemming and Makekau purchased with the insurance funds. To establish their claim of unjust enrichment, Plaintiffs must show, "(1) a benefit has been conferred upon the defendant, (2) the defendant

18

retains the benefit, and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Estate of Draper v. Bank of Am., N.A.*, 288 Kan. 510, 518, 205 P.3d 698, 706 (Kan. 2009). Based on the allegations in the SAC, Plaintiffs have established this claim. Plaintiffs have alleged that the insurance proceeds were collected and retained by both Flemming and Makekau. Those proceeds were payment for Plaintiffs' property that was purchased under the contract. Under Kansas law, Plaintiffs are the equitable owners of the property. Therefore, it is unjust for Makekau to retain the proceeds.

Turning to the relief requested, the SAC seeks both damages in the amount of $239,666.84 and a constructive trust on the proceeds. (Doc. 71 at 15.) In their motion for default judgment, Plaintiffs request judgment in the amount of $249,792.27 and seek a constructive trust on Makekau's North Carolina property. (Doc. 93 at 14.) The requested amount is based on the undisputed damages evidence submitted by Plaintiffs in support of summary judgment.

Under Federal Rule of Civil Procedure 54(c), "a default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Contrary to Plaintiffs' motion for default judgment, the SAC did not seek relief in the form of a constructive trust on specific property. The SAC also sought a lesser amount than Plaintiffs are now seeking. Because the court is limited by Rule 54(c), Plaintiffs requested equitable relief of a constructive trust on the North Carolina property must be denied. Moreover, the court cannot grant judgment in the amount Plaintiffs now seek as it is higher than the amount requested in the SAC. Therefore, Plaintiffs are only entitled to $239,666.84, an amount that was plead in the SAC and is supported by the evidence set forth herein.

Plaintiffs' motion for default judgment on their claim of unjust enrichment against Makekau is granted. The court finds that Plaintiffs are entitled to damages of $239,666.84 on this claim.

## V.     Conclusion

Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART. (Doc. 80.)  Plaintiffs' motion for default judgment is GRANTED IN PART and DENIED IN PART.  (Doc. 92.)  The trial currently set on February 14, 2022 is vacated.  This matter is set for status conference to determine how Plaintiffs want to proceed as to the remaining matters in this action on February 1, 2022, at 1:30 p.m., U.S. Courthouse, Wichita, Kansas, Courtroom 238. IT IS SO ORDERED.  Dated this 11th day of January, 2022.

                                                                               _s/ John W. Broomes_
                                                                               JOHN W. BROOMES
                                                                               UNITED STATES DISTRICT JUDGE